UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MICHELLE D. KANENGIETER,<br><br>              Plaintiff,<br><br>    vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner, Social Security<br>Administration,<br><br>              Defendant. | CIV. 13-4141-KES<br><br><br>ORDER REVERSING AND<br>REMANDING DECISION OF<br>COMMISSIONER |

Plaintiff, Michelle D. Kanengieter, seeks review of the decision of the Commissioner of Social Security denying her claim for disability insurance benefits.[1] The Commissioner opposes the motion and requests that the court affirm the decision. For the following reasons, the court reverses and remands.

**PROCEDURAL HISTORY**

Kanengieter applied for disability insurance benefits on December 6, 2011, alleging disability since February 23, 2011, due to bipolar disorder, anxiety, panic attacks, and depression. AR 127, 153, 157.[2] The Social Security Administration (SSA) denied Kanengieter's application. AR 75-77. After the

---

[1] Although the complaint correctly names Carolyn W. Colvin as the defendant, Kanengieter's briefs mistakenly name Michael J. Astrue in their captions. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013.

[2] All citations to "AR" refer to the appropriate page of the administrative record. All citations to "Supp. AR" refer to the appropriate page of the supplemental administrative record.

initial denial, Kanengieter retained Heather Mueller of Western Professional Associates, Inc., d/b/a Disability Professionals, as a non-attorney representative. AR 79-80.  On reconsideration, SSA again denied Kanengieter's claim. AR 81-82. Kanengieter then requested an administrative hearing and appeared with Mueller before an administrative law judge (ALJ) on January 22, 2013. AR 28-60 (transcript of hearing). Following the hearing, the ALJ issued an unfavorable decision finding that Kanengieter did not have a severe impairment. AR 13-24. Kanengieter timely requested review by the Appeals Council, which request was denied on November 7, 2013.[3] AR 1-6. On December 17, 2013, Kanengieter commenced this action seeking judicial review of the Commissioner's denial of her disability insurance benefits claim. Docket 1. After briefing was complete, the court gave the Commissioner permission to file a supplemental administrative record. Docket 18 (motion); Docket 19 (order); Docket 21 (supplemental record received).[4]

---

[3] Because the Appeals Council denied Kanengieter's request for review, the ALJ's decision represents the final decision of the Commissioner for purposes of judicial review. 42 U.S.C. § 405(g).

[4] Kanengieter filed a motion requesting the court reconsider its order granting permission to file the supplemental record. Docket 20 (objection); Docket 22 (motion). In her motion for summary judgment, Kanengieter alleged that the ALJ improperly considered facts from Kanengieter's previous application for benefits and an expert report that was not included in the first administrative record. Docket 11 at 24-26. The court allowed the Commissioner to file the supplemental record so the court could have the benefit of seeing the information upon which Kanengieter claimed the ALJ improperly relied. Without access to the supplemental transcript, the court would be unable to evaluate Kanengieter's argument except by speculating on what those records may have contained. The court only granted permission to *file* the supplemental record; it did not rule that the information therein was

## FACTS

Kanengieter was born on January 28, 1983. AR 153. She was 29 years old at the time of her administrative hearing. Kanengieter graduated from Paynesville Senior High School, where she indicated she attended special education classes. AR 158. Following high school, Kanengieter enrolled in and completed a one-year vocational training program in the culinary arts. AR 33, 158.

Kanengieter reported three jobs as a cook, one job as a dietary cook, and a job as a shipping clerk on her application for disability insurance benefits. AR 158. In a letter dated February 12, 2013, she referred to working at Walmart for six months, along with working briefly at Granite City, Perkins, and another restaurant, the name of which she could not remember. AR 196-97. She stated that she was fired from a number of jobs because of her mental impairment, including Deno's Southside Café for telling the wife she was a bitch, Walmart due to her behavior, a restaurant due to her interactions with co-workers, Perkins due to interactions with her supervisor and timeliness, and Granite City because she could not stay focused. AR 171 and 196-7. She quit her job as a shipping clerk when she got married and moved to South Dakota. AR 36-37. And she quit her most recent job as a dietary cook at a nursing home because her son was diagnosed with a medical condition and she was pregnant

---

properly considered by the ALJ. The court sees no prejudice to Kanengieter by allowing the Commissioner to provide the court with information that Kanengieter herself placed in issue. The motion for reconsideration (Docket 22) is denied.

with her second child. AR 38-39. She told the ALJ that she had applied to work at Perkins Restaurant in Sioux Falls but never called the manager back to schedule an interview because she had two small children at home and "it was so overwhelming trying to keep up with my household work, being a mother, taking, giving them all my attention that I could not give 100 percent at my job if they did hire me." AR 38.

    Kanengieter described her symptoms:

> I have my up days, where I can be superwoman by being a great mother, which I'm always a great mother, even with my down days. And I can get all my housework done, and then some, you know, by cooking a great meal, baking cookies, having more fun with my children. And when I have my down days, I'm just down in the dumps. I have to force myself to get stuff done around the house, even if it's like half-ass, you know. And I'm just really sad . . . . [W]hen I am having a down day, I get extremely depressed, and I can cry very easily and get very overwhelmed when I'm having a down day.

AR 40-41. Kanengieter told the ALJ that she had down days about three to four times a month and they usually lasted a couple days. AR 41. She recalled problems multitasking and getting work completed on down days. AR 40. Kanengieter also reported difficulty sleeping, concentrating on daily routines, and remembering things. AR 43. According to Kanengieter, her "brain is being pulled in 100 miles this way, 100 miles that way, up and down[.]" AR 42. Kanengieter also has suicidal thoughts and attempted suicide once years ago. AR 44. In a function report dated January 25, 2012, Kanengieter reported panic attacks and a fear of going out in public. AR 166.

    Kanengieter stated that, despite her limitations, she read books to her children and watched television. AR 45. As to her activities of daily living

Kanengieter stated, "I go to playgroup with my kids at different community centers. And then I take my kids to the mall shopping, and we're just walking around. And recently [I] made a new friend, and she invited me to go shopping[.]" AR 46. In her function report, Kanengieter stated that she cares for her children on a daily basis, prepares meals daily, is responsible for cleaning and laundry, shops once a week for two and a half hours, enjoys watching television, working out, and playing with her kids, and frequently goes to church and the grocery store. AR 165-70.

Kanengieter has a history of bipolar disorder, depression, and anxiety. She was diagnosed with bipolar disorder by Dr. Stephen Hahn in St. Cloud, Minnesota, on or around 2006.[5] *See* AR 52, 231. After moving to South Dakota, Kanengieter was first treated at Avera University Psychiatry Associates (AUPA) on April 15, 2010. Kanengieter was initially seen for medication management. AR 206. During that session, Kanengieter reported suicidal thoughts and stress related to financial difficulties. She also reported that she was sleeping "okay." *Id.* Grace LaFollette, a certified nurse practitioner, noted that Kanengieter was pleasant and cooperative, had logical thought production, showed no signs of psychosis, and was alert and oriented. LaFollette also observed that Kanengieter's memory was intact and her abstractive abilities, attention, concentration, insight and judgment were all described as "good." *Id.*

---

[5] Although Kanengieter and other medical providers refer to Dr. Hahn's initial diagnosis, the administrative record does not contain any records or information of Kanengieter's treatment with him or of any treatment at all prior to the records from Avera University Psychiatry Associates.

Kanengieter was diagnosed with bipolar disorder NOS,[6] history of major depressive disorder, recurrent, history of anorexia nervosa, and Cluster B personality traits[7] and was assigned a global assessment of functioning[8] (GAF) score of 60. *Id.*

Kanengieter was seen again by LaFollette and Dr. William Fuller at AUPA on October 4, 2010, for medication management. At the time, she was five months postpartum and had gone back to work. AR 205. The report notes she is "[m]oodwise, doing pretty good [sic]. No signs of depression or anxiety. No signs of psychosis. No self-harm thoughts. Memory is intact. Abstractive ability is intact. Good attention and concentration. Good insight and judgment." *Id.* Her stressors were mild, and Kanengieter was assigned a GAF of 55. *Id.*

Following the alleged onset of her disability, Kanengieter was seen at AUPA on April 4, 2011, by LaFollette and Dr. Fuller. Her diagnosis remained the same. AR 217. The treatment records indicate that "she is now a stay-at-

---

[6] Bipolar disorder NOS means the diagnosis is "not otherwise specified." See AR 211-12. That notation indicates there is "some question of the precision of the diagnosis in full detail." AR 225.

[7] "Cluster B personality disorders are characterized by dramatic, overly emotional or unpredictable thinking or behavior. They include antisocial personality disorder, borderline personality disorder, histrionic personality disorder and narcissistic personality disorder." Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/personality-disorders/basics/symptoms/con-20030111 (last visited Feb. 25, 2015).

[8] The global assessment of functioning ranks psychological, social, and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100. A rating of 41-51 indicates serious symptoms or serious impairments. A 51-60 rating indicates moderate symptoms and a rating of 61-70 indicates mild symptoms. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32-34 (Text Rev. 4th ed. 2000).

home mom and enjoys that." *Id.* The objective findings remained the same, and Kanengieter's GAF was assessed at 60. *Id.*

Kanengieter was seen on October 4, 2011, at AUPA by Drs. Gammeter and Fuller. Her diagnosis was similar, but she reported problems sleeping and a more depressed mood. AR 213. Kanengieter's major depressive disorder was categorized as mild to moderate. AR 214. The report attributed her more depressed mood partially to financial stress and indicated that Kanengieter and her husband were "looking at bankruptcy in the near future." AR 213. The findings regarding her behavior, thought production and content, mental grasp, and cognitive abilities were unchanged, but her GAF was 50. *Id.* at 214.

On November 11, 2011, Kanengieter was seen by Drs. Gammeter and Bean at AUPA. She reported sleeping better and although her stress levels were still high her mood had improved and her depression had not worsened. AR 211. Her depression was rated as moderate. AR 212. Her GAF was 50. *Id.*

During her visit to AUPA on December 9, 2011, Kanengieter reported suffering an anxiety episode. AR 208. She continued to report struggling with depression and situational stressors. *Id.* Her depression was again rated as moderate. AR 209. Although the mental status examination was largely the same, Kanengieter's GAF was assessed at 45 to 50. *Id.*

Kanengieter's last visit to AUPA was February 7, 2012. AR 223. She saw Drs. Wilson and Fuller. AR 219. Dr. Wilson's notes reflect that Kanengieter was struggling with anxiety and panic attacks and she felt overwhelmed with her family responsibilities. *Id.* Dr. Wilson stated that Kanengieter believed she

could not ever return to work "because she does not trust anyone else with her kids." AR 220. Dr. Wilson's diagnosis was "[m]ajor-depressive disorder, recurrent, moderate-to-severe, generalized anxiety disorder with panic attacks, anorexia nervosa per history, bipolar NOS per history." *Id.* Additionally, Dr. Wilson diagnosed Kanengieter with moderate-to-severe psychosocial stressors and assessed her GAF at 45 to 50. *Id.* Kanengieter never treated at AUPA after this visit.[9] AR 223.

Kanengieter began treatment at Southeastern Behavioral Healthcare (SBH) on May 16, 2012. AR 244. In her initial appointment she saw LaFollette, who previously treated her at AUPA. AR 244-45. LaFollette's diagnosis did not change. AR 245. According to LaFollette, Kanengieter's thought progression was normal, her senses and memory were intact, and her attention and concentration were good. *Id.* LaFollette described Kanengieter's present illness as "some problems with moodiness and anxiety" and reported that Kanengieter "[m]ay get somewhat irritable at times with things." AR 244. LaFollette assessed Kanengieter's current GAF at 60. AR 245.

At LaFollette's suggestion, Kanengieter saw Kristy Eckhoff-Speck, a therapist at SBH, on June 7, 2012. AR 241. Kanengieter reported "racing thoughts," memory difficulty, and trouble connecting ideas in conversation. *Id.* She also discussed past abuse issues and her suicidal thoughts. *Id.* Eckhoff-Speck rated Kanengieter's mood/affect and thought processes as "appropriate."

---

[9] During the administrative hearing, Kanengieter stated that she stopped going to AUPA because she disagreed with Dr. Wilson's assessment of her condition. AR 52.

*Id.* Kanengieter only saw Eckhoff-Speck one more time, on July 3, 2012, and the progress notes indicate that Kanengieter focused on marital issues. AR 239. Again, Eckhoff-Speck observed that Kanengieter's mood/affect and thought processes were "appropriate." *Id.*

Kanengieter saw LaFollette for medication management on July 18, 2012, without a change in her observations, diagnosis, or GAF. AR 237-38. A record from SBH dated September 27, 2012, reports that Kanengieter showed poor insight, judgment, and ability to make major decisions. AR 234-35. The report summary focuses on Kanengieter's relationship with her husband. It also indicates that her bipolar diagnosis and GAF were unchanged, but she did not have a severe mental disability. AR 235-36. It is unclear who made that determination, but the report is signed by both Eckhoff-Speck and a clinical supervisor. AR 236.

Kanengieter saw Dr. Paul Frazer at SBH on October 16 and December 19, 2012, for medication management. AR 230-31 (October 16, 2012, notes); AR 225-26 (December 19, 2012, notes). Dr. Frazer reported that Kanengieter's mood was currently an eight out of ten, although her moods shift. AR 231. As to her bipolar disorder, he stated:

> Psychosis: Not presently but interestingly by history when she was younger as a teenager 13 years of age she did hear voices at times when she was depressed and this would certainly bode for the possibility of bipolar disorder, which has been doubted by some psychiatrists here in Sioux Falls. . . . I could not get a history in the family of bipolar disorder or real evidence of that. In her history there are some elements when she has activation symptoms that other critical points for bipolar disorder are not necessarily present so that is why she has been labeled bipolar disorder [NOS] because some of the components are equivocal to say the least and I sense

> that also on questioning but clearly her childhood history of psychosis with depression is significantly in favor of it and also her symptoms that she has of depression, anergia and severe inability to move about and take care of herself and take care of her children as well as she would like . . . ."

*Id.* Later, Dr. Frazer stated, "[f]rom what indicators I have here, in reviewing her records, it would certainly appear that she does suffer from bipolar disorder, NOS[.]" AR 225. On both occasions Dr. Frazer observed Kanengieter's mood, thoughts, and affect to be normal and appropriate. AR 226, 231. Dr. Frazer assessed Kanengieter's GAF at or around 60 on both occasions. AR 226, 231.

After the second visit,[10] Dr. Frazer completed a mental impairment questionnaire. AR 246-49. He diagnosed Kanengieter with bipolar disorder NOS and Cluster B personality traits and assessed both her current GAF and highest GAF in the last year as 60. AR 246. Dr. Frazer reported "significant problems with stress intolerance with collapse of mood" and that Kanengieter is "easily overwhelmed to [the] point of difficulty functioning[.]" *Id.* Also, Dr. Frazer concluded that Kanengieter's mental problems imposed a moderate restriction on her activities of daily living, moderate to marked difficulties on maintaining social functioning, and marked difficulties on maintaining concentration, persistence, or pace. AR 248. Dr. Frazer indicated that, in his opinion, Kanengieter had a medically documented history of at least two years'

---

[10] Although the exhibit list in the administrative record gives a date of December 21, 2012, the form itself is undated.

duration that caused more than a minimal limitation on her ability to do any basic work activity. *Id.*

Dr. Doug Soule, a state agency expert, completed an initial disability determination on February 13, 2012, which concluded that Kanengieter was not disabled. AR 61-67. Dr. Soule determined that Kanengieter suffered from affective disorders, anxiety disorders, and personality disorders. AR 64. Nonetheless, he concluded that she had no restriction on her activities of daily living, mild difficulties in maintaining social functioning, mild difficulties maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. AR 65. He stated that Kanengieter "endorses some anxiety [and] depressed mood which is most attributable to current marital issues [and] financial stressors. Her reaction is not outside the realm of normal for her present situation. . . . Her ADL form does not indicate severely impaired functioning." *Id.* Thus, Dr. Soule found that Kanengieter's medically determinable impairments were not severe. *Id.*

Kanengieter's claim was reviewed at the reconsideration level by a second agency expert, Dr. Richard Gunn, on April 19, 2012. Dr. Gunn's report is not included in the appeal record. Instead, the record contains a transmittal sheet dated April 19, 2012, followed by a second copy of Dr. Soule's determination at the initial level. AR 68-74. Dr. Gunn's opinion was filed with this court as part of a supplemental record. *See* Supp. AR 258-64. Dr. Gunn's findings as to Kanengieter's diagnoses, the severity of Kanengieter's limitations, and her restrictions and difficulties match the findings of Dr. Soule. Supp. AR 261-62.

- 11 -

Also, Dr. Gunn's explanation is largely a verbatim recital of Dr. Soule's explanation. *Compare* AR 65 *with* Supp. AR 262.

At the administrative hearing, the ALJ heard testimony from Tom Audet, an impartial vocational expert (VE). AR 54. The ALJ asked the VE to answer hypothetical questions about an individual with Kanengieter's background, education, and mental limitations, accepting Kanengieter's description of her mental limitations as true. The VE opined that such an individual would be unable to perform Kanengieter's past skilled occupations on a consistent basis due to mood swings and an inability to complete tasks in a timely manner. AR 56-57. The VE also stated that he did not believe such an individual possessed the ability to perform other less mentally challenging work on a consistent and full-time basis. AR 57.

## ALJ DECISION

On February 6, 2013, the ALJ issued a decision denying Kanengieter's application for benefits. AR 11-24. In doing so, the ALJ used the sequential five-step evaluation process.[11] At the first step, the ALJ determined that

---

[11] An ALJ must follow " 'the familiar five-step process' " to determine whether an individual is disabled. *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). 20 C.F.R. § 404.1520(a)(4)(i)-(v) provides that "(i) [a]t the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . . (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement of § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . . (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our

- 12 -

Kanengieter had not engaged in substantial gainful activity since February 23, 2011. AR 13. At step two, the ALJ found that Kanengieter had medically determinable impairments of affective disorder, anxiety disorder, and personality disorder, but those impairments were not severe because they did not significantly limit Kanengieter's ability to perform basic work-related activities. AR 13-14. Specifically, the ALJ relied on the records that indicated Kanengieter was doing relatively well. AR 15-16. The ALJ rejected the low GAF scores because the other objective findings were "benign" and showed no more than a minimal limitation on Kanengieter's ability to work. AR 16. Also, the ALJ relied on Dr. Soule's assessment and generally rejected Dr. Frazer's assessment because the ALJ felt the record as a whole demonstrated that Kanengieter was not significantly limited by her mental issues and her primary concerns were marital and financial. AR 16-22. The ALJ stated that he did not find Kanengieter or Dr. Frazer to be credible based on the inconsistencies with the objective findings in the record. AR 20. The ALJ also found no more than mild limitations in the four broad functional areas known as the "paragraph B" criteria. AR 23. Thus, the ALJ found that Kanengieter was not disabled. AR 24.

---

listings in appendix 1 of [subpart P of part 404 of this chapter] and meets the duration requirement, we will find that you are disabled. . . . (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . . (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled."

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). The court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on

proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

At step two, Kanengieter must establish whether she has a medically determinable physical or mental impairment that is severe.[12] 20 C.F.R. § 404.1520(a)(4)(ii); *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("It is the claimant's burden to establish that [her] impairment or combination of impairments are severe.") (citation omitted). It is well settled that "[d]enial of benefits at step two is justified for only those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Nguyen*

---

[12] To be considered severe, an impairment must "significantly" limit the claimant's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1521(a), such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, remembering simple instructions, using judgment, responding appropriately to usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b)(1)-(6).

*v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996) (internal quotations omitted). "The sequential analysis can be discontinued at step two 'when an impairment or combination of impairments would have no more than a minimal effect on the claimant's ability to work.' " *Dixon v. Barnhart*, 353, F.3d 602, 605 (8th Cir. 2003) (quoting *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001)).

The Commissioner's regulations acknowledge that "[g]reat care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment . . . the sequential evaluation process should not end with the not severe evaluation step." Social Security Ruling 85-28, 1985 WL 56856, at *4. A finding that an impairment has no more than a minimal effect on a claimant's physical or mental abilities to perform basic work activities must be "clearly established by medical evidence[.]" *Id.* at *3. Step two thus applies a "de minimus standard" to dispose of groundless claims. *Hudson v. Bowen*, 870 F.2d 1392, 1395-96 (8th Cir. 1989) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)).

The ALJ found that Kanengieter's diagnoses were medically determinable impairments.[13] AR 22. But the ALJ rejected Kanengieter's subjective

---

[13] The Commissioner argues that Kanengieter's GAF scores only represent symptoms and therefore do not reflect the limitations of her mentally determinable impairments. Docket 16 at 13. The ALJ accepted that Kanengieter had medically determinable impairments which could be the basis for her symptoms. Unlike a symptom, a medically determinable impairment can be the basis for a finding of disability. Social Security Ruling 96-4p, 1996 WL 374187, at *1 ("No symptom or combination of symptoms can be the basis for a finding of disability . . . unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment."). Furthermore, although the GAF scores are based in part

statements about her alleged disabilities and the findings of her treatment
providers because they were inconsistent with the objective findings present in
the record. AR 16-17 (discussing the objective findings); AR 21-22 (rejecting
Dr. Frazer's assessment). Also, the ALJ found Dr. Soule's opinion to be credible
because it was consistent with Kanengieter's level of activity and the objective
findings reported in the medical records. AR 17-18.

The ALJ focused primarily on treatment notes reflecting that Kanengieter
was well groomed, oriented, alert, had intact thought processes, was otherwise
doing well, and primarily reported problems relating to her marriage, financial
issues, or her newborn children. *See* AR 15-17. Although the medical records
contain the information cited by the ALJ, the record also contains information
showing substantial limitations.[14] A patient can outwardly appear normal on

on Kanengieter's complaints to her treatment providers, the scores represent
the judgment of the treatment provider, not the claimant. *See Juszczyk*, 542
F.3d at 627 n.2.

[14] *See, e.g.,* AR 205 (October 4, 2010, record showing a GAF of 55); AR
217 (April 4, 2011, record showing a GAF of 60); AR 213-16 (October 4, 2011
record showing a down mood, increased depression, and a GAF of 50); AR 211-
12 (November 11, 2011, record showing a down mood, moderate depression,
and a GAF of 50); AR 208-09 (December 9, 2011, record showing increased
stress and anxiety, moderate depression, and a GAF of 45 to 50); AR 219-21
(February 7, 2012, record showing anxiety, panic attacks, significant mood
fluctuations, only fair insight and judgment, moderate-to-severe depression,
blunted affect, and a GAF of 45 to 50); AR 244-45 (May 16, 2012, record
showing problems with moodiness and anxiety and a GAF of 60); AR 241-42
(June 7, 2012, record showing claims of feeling overwhelmed, racing thoughts,
poor memory, and an inability to connect ideas); AR 237-38 (July 18, 2012,
record showing increasing anxiety and a GAF of 60); AR 234-36 (September 27,
2012, record showing poor insight, poor judgment, poor ability to make major
decisions, and a GAF of 60); AR 230-31 (October 16, 2012, record showing
depression, shifting moods, and a GAF of 60); AR 225-26 (December 19, 2012,
record showing feelings of being overwhelmed, strained to dysthymic mood,

the day of a visit but still suffer from a severe mental impairment. *See Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (noting that a claimant with bipolar disorder "need not be bedridden in order to be unable to work"); *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008) (stating that a determination that a claimant can work simply because on some days the claimant "dresses appropriately, shops for food, prepares meals and performs other household chores" indicates "a lack of acquaintance with bipolar disorder"). The ALJ's conclusion—that Kanengieter's grooming, appearance, and lack of psychosis on certain days necessarily undermined the conclusions and diagnoses made by numerous treatment providers—is flawed because it fails to account for other limitations not externally visible and for the fluctuations in functioning associated with bipolar disorder.

Also, each treatment provider who made the factual observations on which the ALJ relied assigned Kanengieter a GAF score indicating moderate to severe limitations. These GAF scores incorporated all observations made by the treatment provider. *See Juszczyk*, 542 F.3d at 627 n.2 (noting that the GAF "is used to report *the clinician's judgment* of the individual's *overall level of functioning*." (italics added) (internal quotation marks omitted)). Thus, the fact that a patient shows certain traits indicating a normal level of functioning does not necessarily contradict a lower GAF score if a patient also shows limitations in other areas. Because a GAF score represents the treatment provider's opinion of the total overall functioning of a claimant, the ALJ improperly

and a GAF around 60).

focused on only part of the information and disregarded the other observations and the ultimate conclusions of Kanengieter's treatment providers.[15]

The ALJ also improperly disregarded Dr. Frazer's treating source opinion. Recognizing limitations in some areas but not others or noting that limitations fluctuate over time does not render a medical opinion internally inconsistent. *See Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003) ("We fail to see the inconsistency in these two statements. It is possible for a person's health to improve, and for the person to remain too disabled to work."). Thus, the fact that Dr. Frazer concluded that Kanengieter could function in some ways but was limited in others is not an internal inconsistency. Also, there is consistency among all treatment providers as to Kanengieter's diagnoses, symptoms, and GAF. Even though Dr. Frazer had a limited treatment history with Kanengieter, the ALJ was not free to ignore his opinion without a more well-founded basis. *See* Social Security Ruling 96-2p, 1996 WL 374188, at *4 (stating that even when a treating source opinion is inconsistent with substantial evidence in the record, the opinion should not be rejected outright and is still "entitled to deference").

The ALJ assigned significant weight to Dr. Soule's opinion. AR 17-18. Dr. Soule's opinion, by itself, is not substantial evidence. *See Cox*, 345 F.3d at

---

[15] Although an ALJ is not bound by a claimant's GAF score, those scores may still be helpful in determining a claimant's functioning, particularly when the scores are consistent. *See Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010); *Pate-Fires*, 564 F.3d at 944 (discussing a claimant's GAF history at 50 or below and noting that it demonstrated serious symptoms or serious impairment).

610 ("We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision. This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." (internal citation omitted)). Dr. Soule's opinion is consistent with the objective findings that the ALJ chose to highlight, but it is inconsistent with the conclusions of every other treatment provider. Those treatment providers actually made the objective findings on which the ALJ relied. Significantly, unlike Dr. Soule, those treatment providers had the opportunity to see and hear Kanengieter before determining whether she experienced more than minimal limitations on her ability to work. Even after making the objective observations cited by the ALJ and used by Dr. Soule, those treatment providers still uniformly concluded that Kanengieter experienced moderate to severe functional limitations.

Although a claimant's specific vocational factors such as age, education, or work experience are not considered at step two, that step does involve a determination based on medical factors that a claimant's medically determinable impairments significantly limit the claimant's ability to perform most jobs. *Yuckert*, 482 U.S. at 146. Evidence from a VE may be considered at step two. *See Gilbert v. Apfel*, 175 F.3d 602, 604 (8th Cir. 1999) (relying on VE testimony to reverse and remand a decision terminating at step two and stating that "the vocational expert's answers to the ALJ's hypothetical questions are strong evidence that Ms. Gilbert's impairments are indeed severe"). The ALJ

may find fewer or less severe impairments than those included in the hypothetical to the VE. *Id.*

Here, the VE testified that a hypothetical individual with Kanengieter's alleged limitations would not be able to work due to her mood swings, her inconsistent pace, and her inability to complete tasks on time and multitask. AR 56-58. As in *Gilbert*, the VE's testimony that an individual with Kanengieter's limitations could not work at all is strong evidence that her impairments, even if less than what she described, are severe enough to impose more than a minimal limitation on her ability to work. The objective findings and activities of daily living in the record do not rebut the VE's concern regarding Kanengieter's ability to complete tasks in a timely manner on her bad days.

Although some evidence supports the ALJ's finding, the ALJ did not address, distinguish, or acknowledge the other evidence in the record that indicates the presence of a severe disability. Dr. Soule's report is not substantial evidence. After weighing the evidence in the record both supporting and detracting from the ALJ's decision, the court finds that the ALJ's determination that Kanengieter has not shown more than a minimal limitation on her ability to work is not supported by substantial evidence. Thus, the court reverses the decision of the Commissioner and remands this matter for further proceedings.[16]

---

[16] Because the court is remanding, it is unnecessary to address Kanengieter's alternative argument regarding whether the ALJ improperly

## CONCLUSION

A step two denial requires that a claimant have no more than a minimal limitation on the claimant's ability to work. The ALJ's conclusion that Kanengieter does not have more than minimal limitations is not supported by substantial evidence. The court does not hold that Kanengieter is actually disabled. It only finds that the ALJ improperly stopped the sequential evaluation at step two.  Accordingly, it is

ORDERED that the Commissioner's decision denying Kanengieter's claim for disability insurance benefits is reversed, and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

IT IS FURTHER ORDERED that the motion for reconsideration (Docket 22) is denied.

Dated March 19, 2015.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

considered evidence not in the record.